UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

ANNETTE M. CAVINS,                )
                                  )
     Plaintiff,                 )
                                  )
     v.                         )          CAUSE NO. 1:21-cv-00047-SLC
                                  )
COMMISSIONER OF SOCIAL            )
SECURITY, *sued as Kilolo Kijakazi*,[1]    )
                                  )
     Defendant.                 )

## OPINION AND ORDER

Plaintiff Annette M. Cavins appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI").  (ECF 1).  For the following reasons, the Commissioner's decision will be

AFFIRMED.

## I.  FACTUAL AND PROCEDURAL HISTORY

Cavins applied for DIB and SSI in December 2017, alleging disability as of October 27,

2017.[2]  (ECF 16 Administrative Record ("AR") 25, 315-24).  Cavins's claim was denied initially

and upon reconsideration.  (AR 25, 112-13).  On April 27, 2020, administrative law judge

("ALJ") Genevieve Adamo conducted an administrative hearing at which Cavins, who was

represented by counsel, and a vocational expert ("VE") testified.  (AR 47-76).  On May 12,

---

[1]  Kilolo Kijakazi is now the Acting Commissioner of Social Security, *see, e.g.*, *Butler v. Kijakazi*, 4 F.4th 498 (7th Cir. 2021), and thus, she is automatically substituted for Andrew Saul in this case, *see* Fed. R. Civ. P. 25(d).

[2]  Regardless of a claimant's claimed onset date, SSI is not payable until the month following the month in which a claimant files her SSI application.  *See* 20 C.F.R. § 416.335.  Therefore, the first month Cavins could be eligible to receive SSI is January 2018, given that she applied for SSI in December 2017.

2020, the ALJ rendered an unfavorable decision to Cavins, concluding that she was not disabled because despite the limitations caused by her impairments she could perform a significant number of other unskilled, light-exertional jobs in the national economy.  (AR 25-38).  The Appeals Council denied Cavins's request for review (AR 7-11), at which point the ALJ's decision became the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.

Cavins filed a complaint with this Court on February 3, 2021, seeking relief from the Commissioner's decision.  (ECF 1).  In her opening brief, Cavins argues that the ALJ failed to: (1) account for all of her mental impairments when assigning the mental residual functional capacity ("RFC"); (2) account for all her right upper extremity limitations when assigning the physical RFC; and (3) show that work exists in significant numbers in the national economy that she can perform despite the limitations caused by her impairments.  (ECF 24 at 1).

At the time of the ALJ's decision, Cavins was fifty-one years old (AR 315); had a high school education and two years of college (AR 361); and had past relevant work experience as a press operator, production worker, production assembler, and embroidery operator (AR 36, 362). In her application, Cavins alleged disability due to mild bulging discs, a pinched nerve, a Baker's cyst behind her right knee, anxiety, depression, and mood swings.  (AR 360).

## II.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

2

adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed "only if [it is] not supported by substantial evidence or if the ALJ applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Id.* (citations omitted). "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III. ANALYSIS

#### A. The Law

Under the Act, a claimant seeking DIB or SSI must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also* 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

requiring consideration of the following issues, in sequence:  (1) whether the claimant is

currently unemployed in substantial gainful activity, (2) whether she has a severe impairment,

(3) whether her impairment is one that the Commissioner considers conclusively disabling, (4)

whether she is incapable of performing her past relevant work, and (5) whether she is incapable

of performing any work in the national economy.[3]  *Dixon v. Massanari*, 270 F.3d 1171, 1176

(7th Cir. 2001); *see also* 20 C.F.R. §§ 404.1520, 416.920.  An affirmative answer leads either to

the next step or, on steps three and five, to a finding that the claimant is disabled.  *Zurawski v.

Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three

stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.*  The burden of proof

lies with the claimant at every step except the fifth, where it shifts to the Commissioner.

*Clifford*, 227 F.3d at 868.

### B.  The Commissioner's Final Decision

On May 12, 2020, the ALJ issued a decision that ultimately became the Commissioner's

final decision.  (AR 25-38).  At step one, the ALJ concluded that Cavins had not engaged in

substantial gainful activity since October 27, 2017, her alleged onset date.  (AR 27).  At step

two, the ALJ found that Cavins had the following severe impairments:  status post right shoulder

rotator cuff tear, lumbar degenerative disc disease, trochanteric bursitis in the left hip, Baker's

cyst and osteoarthritis in the right knee, major depressive disorder, anxiety disorder, post-

traumatic stress disorder (PTSD), and personality disorder.  (AR 27-28).  At step three, the ALJ

concluded that Cavins did not have an impairment or combination of impairments severe enough

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks she can
do despite her limitations.  20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a).  The RFC is then used
during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. §§
404.1520(e), 416.920(e).

4

to meet or equal a listing.  (AR 28).

Before proceeding to step four, the ALJ determined that Cavins's symptom testimony, was "not entirely consistent with the medical evidence and other evidence in the record . . . ."  (AR 32).  The ALJ assigned Cavins the following RFC:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to the following additional limitations:  The claimant should never climb ladders, ropes, or scaffolds.  She is able to occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  She should avoid wet and slippery surfaces and unprotected heights.  She is able to perform occasional overhead reaching with the dominant right upper extremity.  She is able to perform simple, routine, and repetitive tasks with no production rate pace like assembly line work with only simple work-related decision making.  She is able to maintain attention and concentration for two-hour segments.  She could respond appropriately to predictable, routine changes in the workplace, but changes should be introduced slowly.  She could have brief and superficial interactions with supervisors and coworkers defined as occasional interactions with supervisors apart from what is necessary for general instruction, task completion, or training, and occasional interactions with coworkers.  She could not perform tandem tasks.  She could have occasional interaction with the general public.  She could perform frequent feeling, handling and fingering with the dominant right upper extremity.

(AR 30).

The ALJ determined at step four that given the foregoing RFC, Cavins could not perform any of her past relevant work.  (AR 36).  However, at step five the ALJ found that Cavins could perform a significant number of unskilled, light-exertional unskilled jobs in the national economy, including inspector/hand packager, laundry worker, and housekeeper.  (AR 37).  Therefore, Cavins's applications for DIB and SSI were denied.  (AR 38).

### C.  The Mental RFC

Cavins first contends that the ALJ failed to adequately account for all of her mental limitations when assessing her mental impairments and crafting a mental RFC, resulting in a

mental RFC that "was inconsistent with the weight of the medical evidence, including the medical opinions." (ECF 24 at 8). Specifically, Cavins argues that: (1) the medical source opinions of the state agency doctors "support that [she] is socially more limited than the ALJ assessed," and (2) the ALJ failed to account for her "moderate" limitations in concentration, persistence, or pace in the mental RFC. (*Id.* at 8-14). For the following reasons, Cavins's argument is unavailing.

As recited earlier, the ALJ assigned Cavins the following mental RFC:

> She is able to perform simple, routine, and repetitive tasks with no production rate pace like assembly line work with only simple work-related decision making. She is able to maintain attention and concentration for two-hour segments. She could respond appropriately to predictable, routine changes in the workplace, but changes should be introduced slowly. She could have brief and superficial interactions with supervisors and coworkers defined as occasional interactions with supervisors apart from what is necessary for general instruction, task completion, or training, and occasional interactions with coworkers. She could not perform tandem tasks. She could have occasional interaction with the general public.

(AR 30). The RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," meaning eight hours a day, for five days a week. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (second emphasis omitted). That is, the "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* at *1; *see also Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004); 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

> The [RFC] assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.

6

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. §§ 404.1545(a)(3),

416.945(a)(3).

When determining the RFC, the ALJ must consider all medically determinable impairments,

mental and physical, even those that are non-severe.  20 C.F.R. §§ 404.1545(a)(2),

416.945(a)(2); *see also Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).  "[An] ALJ is not

required to rely entirely on a particular physician's opinion or choose between the opinions of

any of the claimant's physicians."  *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).  Rather,

"the determination of a claimant's RFC is a matter for the ALJ alone—not a treating or

examining doctor—to decide."  *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (citing 20

C.F.R. § 404.1527(d)).

Here, the ALJ thoroughly considered Cavins's symptom testimony (AR 31-32), but

concluded that Cavins's depiction of the severity of her mental symptoms was "not entirely

consistent" with the medical evidence and other evidence of record (AR 32).  In reaching this

conclusion, the ALJ observed that Cavins had pursued little psychiatric treatment, and her

mental status examinations reflected "grossly normal findings other than occasional tearfulness

or depressed mood."  (AR 29, 33 (citing AR 481, 580, 592, 635, 770)).  The ALJ further

considered that while Cavins was briefly hospitalized in November 2019 after taking excessive

antihistamines and Tylenol, Cavins reported that she was not attempting to commit suicide but

just wanted to go to sleep after a fight with her significant other.  (*Id.*).  She was discharged the

next day with home medications and then failed to pursue ongoing mental health services

thereafter.  (*Id.*).  Notably, Cavins does not directly challenge the ALJ's assessment of her

symptom testimony.  (*See* ECF 24 at 8-19).

1.  Social Limitations

Cavins first argues that the medical source opinions of the state agency doctors support greater social limitations that the ALJ assessed in the mental RFC.  (ECF 24 at 9-13).  In support,  Cavins cites the opinion of Russell Coulter-Kern, Ph.D., H.S.P.P., who examined her in March 2018, and  the opinions of Maura Clark, Ph.D., and Cindy Matyi, Ph.D., the state agency psychologists who reviewed her record in March and October 2018, respectively.  (*Id.*).

Dr. Coulter-Kern found that Cavins would have "significant difficulty responding appropriately to supervision and coworkers in a work setting."  (AR 533).  Dr. Clark opined that Cavins was moderately limited in her ability to interact with the general public and supervisors, but not significantly limited with coworkers, and concluded in her narrative:

> It appears that [Cavins] would be able to manage occasional contact with the public but sustained, intensive, interpersonal contact would be precluded.  [She] would appear to work best alone, in semi-isolation from others or as part of a small group.  Totality of the [medical evidence of record] suggests [Cavins] seems to be able to maintain at least a minimal level of relationship with others. [She] could work with a supervisor who was normally considerate and positive, but would have problems with a supervisor who was often negative, critical, or quarrelsome.

(AR 95-96, 108-09).  More recently, Dr. Matyi concluded that Cavins was moderately limited in her ability to interact with the general public, supervisors, and co-workers, but could still "relate adequately on a superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers, and no over-the-shoulder supervisor scrutiny."  (AR 161, 180).

Cavins first suggests that the ALJ erred by failing to include in the RFC Dr. Clark's limitation that she work with a supervisor who was "normally considerate and positive."  (ECF 24 at 10; *see* AR 96, 109).  Dr. Clark, however, also concluded that Cavins could "maintain at

8

least a minimal level of relationship with others." (AR 96, 109). The ALJ found Dr. Clark's

March 2018 opinion just "partially persuasive," commenting that Cavins's mental health

impairment "more greatly affects her ability to maintain concentration and manage herself."

(AR 34). The ALJ's logic in that comment is a bit difficult to trace, given that the ALJ found

Cavins was moderately limited in her ability to interact with others, as well moderately limited in

concentrating, persisting, or maintaining pace and adapting or managing onself. (AR 29).

Nevertheless, the ALJ made quite clear that she found Dr. Matyi's more recent opinion "more

persuasive" than Dr. Clark's earlier opinion, given "the additional evidence received at the

reconsideration and hearing levels." (AR 34). To reiterate, "the determination of a claimant's

RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." *Thomas*,

745 F.3d at 808 (citing 20 C.F.R. § 404.1527(d)). The ALJ was not required to adopt all of Dr.

Clark's limitations verbatim, particularly where the ALJ found Dr. Clark's opinion only partially

persuasive.

Next, Cavins argues that the ALJ's limitation to "occasional interactions with supervisors

apart from what is necessary for general instruction, task completion, or training" exceeds the

limitations for supervisory interaction assigned by Dr. Coulter-Kern and the state agency

psychologists.[4] (ECF 24 at 10-11). No so. Dr. Matyi, whose opinion the ALJ found "more

persuasive" (AR 34), opined only that Cavins should have "no over-the-shoulder supervisor

scrutiny" (161, 180), which appears less restrictive than the assigned RFC.

And while Dr. Coulter-Kern penned that Cavins would have "significant difficulty

---

[4] "'Occasionally' means occurring from very little up to one-third of the time." SSR 83-10, 1983 WL
31251, at *5 (Jan. 1, 1983).

responding appropriately to supervision" (AR 533), Dr. Coulter-Kern "did not assess a specific limitation as to [Cavins's] social interaction," and a limitation to "occasional" contact is not necessarily inconsistent with Dr. Coulter-Kern's finding, *Dorsey v. Berryhill*, No. 3:18-cv-103-HBG, 2019 WL 1140178, at *5 (E.D. Tenn. Mar. 12, 2019) (rejecting the claimant's argument that a limitation to "occasional" interaction with supervisors and coworkers failed to adequately account for a doctor's finding of a "marked limitation in social interactions" (collecting cases)). *See also St. Cyre v. Saul*, No. 4:18 CV 627 DDN, 2019 WL 2716193, at *3 (E.D. Mo. June 28, 2019) ("Dr. Knipp's opinion that plaintiff would likely have significant difficulty getting along with others . . . [is] consistent with the ALJ's RFC determination that . . . [plaintiff] should have only occasional interaction in person with the public, co-workers, and supervisors." (quotation marks omitted)); *Hunt v. Comm'r of Soc. Sec. Admin.*, No. 5:17-cv-02089, 2018 WL 7082062, at *19 (N.D. Ohio Sept. 25, 2018) (concluding that the claimant failed to show that a limitation to occasional contact with supervisors, coworkers, and the public was insufficient to account for a doctor's opinion that the claimant would likely have "significant difficulty dealing with fellow employees and supervisors in a work setting").

Next, Cavins argues that Dr. Clark's March 2018 opinion and Dr. Matyi's October 2018 opinion were "out of date by the hearing." (ECF 24 at 11). She emphasizes that in April 2019 she returned to Park Center seeking medication for her mental health symptoms, complaining of racing thoughts, difficulty sleeping, feeling upset with her family, panic attacks, paranoia, and feeling depressed. (AR 744-48). She had not followed up after her last Park Center intake because she had moved several times. (AR 744). She was not taking any mental health medications at the time but had previously been prescribed Zoloft and Paxil. (*Id.*). A mental

status exam revealed a cooperative attitude; appropriate behavior and appearance; coherent thoughts; congruent affect; depressed and anxious mood; rapid speech at times; paranoid, depressive, and helpless thought content; normal perception; fair judgment and insight; and normal memory.  (AR 746-47).  She denied having any hallucinations or suicidal or homicidal thoughts.  (AR 747).  She was diagnosed with PTSD and a major depressive disorder, severe, single episode, with anxious distress.  (*Id.*).  She was started on Pristiz for depression and anxiety, Trazodone for sleep, and Hydroxyzine for anxiety.  (AR 748).

It is true that "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion."  *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018) (citations omitted).  But the April 2019 Park Center intake evaluation is not significant evidence that reasonably could have changed the state agency doctors' opinions, as the evaluation reflects that Cavins had not been taking any mental health medications and thus was seeking symptom relief again through medications.  Furthermore, the ALJ did consider the April 2019 examination, observed that it "noted similar findings as the prior [examination]" (AR 33), which was considered by Dr. Matyi (AR 155).  *See generally Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("[B]ecause it is always possible to identify one more test or examination an ALJ might have sought, the ALJ's reasoned judgment of how much evidence to gather should generally be respected.").  And in any event, as the ALJ noted, Cavins still did not follow up with additional treatment after the April 2019 examination.  (AR 33).

Cavins also asserts that the state agency doctors opinions were stale because they did not have the records from her brief hospitalization in November 2019 after she took excessive

antihistamines (allegedly nine Zyrtec) and some Tylenol.[5]  (ECF 24 at 11-12; *see* AR 952-74).  She contends this is evidence of her "worsening issues."  (ECF 24 at 12).  But the ALJ adequately considered this evidence, noting that Cavins denied any suicidal thoughts at the emergency room and reported that took the Zyrtec and Tylenol to help her sleep after an argument with her significant other.  (AR 33, 953).  The ALJ also correctly noted that Cavins did not pursue any "ongoing" mental health services after the hospitalization.[6]  (AR 29, 33, 64).  Therefore, on this record, Cavins fails to show that this evidence reasonably could have changed the state agency doctors' opinions.  *See Moreno*, 882 F.3d at 728.

In sum, none of Cavins's arguments challenging the social limitations assigned by the ALJ warrant remand.  The ALJ adequately considered the evidence before her and sufficiently articulated an accurate and logical bridge between the evidence to the social limitations articulated in the mental RFC.  *See Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (stating that an ALJ is required to "build an accurate and logical bridge between the evidence and the result").

2. <u>Limitations in Concentration, Persistence, or Pace</u>

Cavins also argues that the mental RFC fails to account for her moderate limitations in

---

[5] Cavins apparently was not taking her mental health medications at the time, as she told the emergency room doctor that she "is supposed to be on antidepressants."  (AR 953).  She was discharged as "stable" the next day.  (AR 973).

[6] Cavins contends the ALJ "wrongly states that [she] did not pursue mental health ongoing services after the hospitalization."  (ECF 24 at 12).  Not so.  The record is devoid of any medical records reflecting regular mental health services following her hospitalization, and it is "[i]t is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove [her] claim of disability."  *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)).  While Cavins points to her hearing testimony in an attempt to fill the void (AR 64), as stated *supra,* the ALJ found Cavins's symptom testimony not entirely consistent with the evidence of record, and Cavins does not directly challenge that conclusion.

concentration, persistence, or pace.  (ECF 24 at 13).  For the following reasons, Cavins's second argument also fails to necessitate remand of the mental RFC.

The ALJ found at step three that Cavins had a "moderate" limitation in concentrating, persisting, or maintaining pace, explaining that "[m]ost mental status examinations note no abnormality in this area, but her anxiousness and physical pain complaints would have some impact on her overall functioning, including limiting her ability to maintain an assembly-line type pace."  (AR 29).  The ALJ then assigned the following mental limitations in the RFC relevant to Cavins's difficulties with maintaining concentration, persistence, or pace:

> [Cavins] is able to perform simple, routine, and repetitive tasks with no production rate pace like assembly line work with only simple work-related decision making.  She is able to maintain attention and concentration for two-hour segments.  She could respond appropriately to predictable, routine changes in the workplace, but changes should be introduced slowly.

(AR 30).

Cavins argues that limitations to "[s]imple, routine[,] repetitive work and maintaining concentration for 2-hour periods" and "no assembly line work" fail to account for her moderate limitations in concentration, persistence, or pace.  (ECF 24 at 13).  In support, Cavins cites *DeCamp v. Berryhill*, in which the Seventh Circuit Court of Appeals found an ALJ's limitation to "unskilled work" with no "fast-paced production line or tandem tasks" was insufficient to account for the claimant's moderate limitation in concentration, persistence, or pace.  916 F.3d 671, 675-76 (7th Cir. 2019) ("We have previously rejected similar formulations of a claimant's limitations because there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, and pace." (citing *Moreno*, 882 F.3d at 730; *O'Connor-Spinner v. Colvin*, 832 F.3d

690, 698 (7th Cir. 2016))).

But in *DeCamp*, the state agency doctors listed moderate limitations in concentration in the checkbox section of their reports but failed to address such limitations in their narrative conclusions.  *Id.*  Here, after noting "moderate" limitations in several areas of the checkbox section pertaining to concentration, persistence, or pace,[7] Dr. Matyi then translated this checkbox section into the following narrative conclusion:  "Depressed, anxious, moody, suspicious. Nonetheless, the claimant can carry out simple and occasional complex tasks, *maintain attention*, make simple decisions, and *adequately adhere to a schedule*."  (AR 161, 180 (emphasis added)). "[A]n ALJ may reasonably rely upon the opinion of a medical expert who translates [checkbox] findings into an RFC determination."  *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019) (citing *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002)); *see Urbanek v. Saul*, 796 F. App'x 910, 915 (7th Cir. 2019) ("Although checklist observations cannot be ignored, they are perhaps less useful to an ALJ than a doctor's narrative summary and do not outweigh the narrative opinions." (citation and internal quotation marks omitted)).

Furthermore, "[e]ven generic limitations, such as limiting a claimant to simple, repetitive tasks, may properly account for moderate limitations in concentration, persistence, and pace, so long as they adequately account for the claimant's demonstrated psychological symptoms found in the record."  *Urbanek*, 796 F. App'x at 914 (citations and internal quotation marks omitted). Notably, Dr. Clark found that Cavins had just "mild" limitations in maintaining concentration,

---

[7] Specifically, Dr. Matyi found that Cavins was moderately limited in her ability to:  (1) maintain attention and concentration for extended periods; (2) work in coordination with or in proximity to others without being distracted by them; and (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 160-61, 179-80).

persistence, or pace when assessing the "B" criteria of the listings, and no "sustained concentration and persistence limitations" in the mental RFC. (AR 91, 95, 104, 108). Similarly, Dr. Coulter-Kern, the examining psychologist, concluded that Cavins would "have little difficulty understanding, remembering, and carrying out instructions . . . . [and] maintaining attention and concentration." (AR 533). And while Dr. Coulter-Kern also opined that Cavins would "have difficultly coping appropriately to work pressures" (AR 533), the ALJ specifically stated that she restricted Cavins to "unskilled work to relieve [her] of the additional pressures which may aggravate her mental health symptoms." (AR 35).

     As the Commissioner points out, the Seventh Circuit has upheld similar limitations as the ALJ assigned here as consistent with moderate limitations in maintaining concentration, persistence, or pace when such limitations are supported by the record. (ECF 25 at 8); *see, e.g.*, *Kuykendoll v. Saul*, 801 F. App'x 433, 438 (7th Cir. 2020) (finding that a limitation to "simple, routine, and repetitive work tasks" and "simple work-related decisions in dealing with changes in the work setting" adequately accounted for the claimant's moderate difficulties in maintaining concentration, persistence, or pace); *Dudley v. Berryhill*, 773 F. App'x 838, 842 (7th Cir. 2019) (finding that a limitation to "work requiring the exercise of only simple judgment" specifically accounted for the claimant's concentration difficulties); *Pytlewski v. Saul*, 791 F. App'x 611, 615-16 (7th Cir. 2019) (affirming an RFC for simple, routine, and repetitive tasks and simple, work-related decisions with respect to the claimant's moderate difficulties in concentration, persistence, or pass, noting that it was supported by the state agency psychologists' checklist and narrative assessments and that "such a hypothetical may be adequate when it restricts a claimant with 'stress- or panic-related' limitations . . . to low-stress work").

In sum, while "the most effective way to inform the VE fully of a claimant's limitations [including moderate limitations in concentration, persistence, or pace] is to include all of them directly in the hypothetical," *Dudley*, 773 F. App'x at 842 (citation and internal quotation marks omitted), "there is no magic words requirements," *Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020 (citation omitted)).  Simply, "the ALJ must account for the totality of a claimant's limitations in determining the proper RFC."  *Id.* (citation and internal quotations marks omitted). Here, the ALJ adequately accounted for Cavins's moderate limitation in concentration, persistence, or pace by the language used in the mental RFC.  *See, e.g.*, *Bailey v. Kijakazi*, No. 1:20-CV-249 RLM, 2022 WL 855763, at *4 (N.D. Ind. Mar. 22, 2022) (affirming similar limitations as adequate to account for the claimant's moderate deficits in concentration, persistence, or pace).  Consequently, the mental RFC does not provide a basis for remand.

### D.  The Physical RFC

Next, Cavins argues that the ALJ failed to adequately account for her right upper extremity limitations in the physical RFC.  (ECF 24 at 14-15).  This argument, too, is unpersuasive.

The ALJ limited Cavins in the physical RFC to lifting and carrying at the light-exertional level, that is, ten pounds frequently and twenty pounds occasionally, *see* SSR 83-10, 1983 WL 31251, at *5-6; "occasional overhead reaching with the dominant right upper extremity"; and "frequent feeling, handling and fingering with the dominant right upper extremity."  (AR 30). Cavins does not describe any additional right upper extremity limitations that she thinks should have been included in the RFC.  Rather, Cavins argues that the ALJ should have consulted a medical expert to review a February 2020 neurological exam and nerve conduction and EMG results rather than formulate her own lay assessment of this evidence.  (ECF 24 at 15).

16

The ALJ considered Cavins's testimony claiming more severe upper extremity limitations, but found that her testimony was not entirely consistent with the medical evidence and other evidence of record.  (AR 31-32).  In doing so, the ALJ noted that Cavins's "more prevalent physical impairment is her right shoulder rotator cuff tear," which she incurred from a fall in January 2018.  (AR 32).  At some point following Cavins's injury, Steven Wynder, M.D., an orthopedist, referred her to physical therapy, but physical therapy notes from August 2018 reveal that she attended only a few sessions and then cancelled the rest because she was moving out of state.  (AR 32 (citing AR 736, 858)).  Cavins returned to Dr. Wynder in February 2019, who referred her back to physical therapy, and four weeks later she reported fifty percent improvement in her right shoulder.  (AR 32-33 (citing AR 732-35)).  Dr. Wynder noted that Cavins still had some mild impingement, 4/5 strength in her right upper extremity, and that she had a good chance of getting better without surgery.  (AR 33 (citing AR 732)).  The ALJ observed that physical therapy notes in May 2019 reflect that Cavins was instructed to return to Dr. Wynder due to her lack of further progress, but the record is devoid of any additional visits to Dr. Wynder or any other orthopedist.  (*See id.* (citing AR 756)).

The ALJ did note that Cavins saw James C. Stevens, M.D., a neurologist, in February 2022 upon referral by Dr. Wynder for a two-year history of right upper extremity pain with temperature changes, increased symptoms when raising her arm above her shoulder, and reduced sensation in her right thumb.  (*Id.* (citing AR 1025)).  While Dr. Stevens observed that Cavins had color and temperatures changes in her distal right upper extremity and a positive Adson sign, the results of nerve conduction studies and an EMG were normal.  (*Id.*; *see* AR 1025-28).  Thus, there was no electrical evidence of an underlying entrapment neuropathy, peripheral neuropathy,

radiculopathy, or plexopathy, though Dr. Stevens could not exclude the possibility of underlying thoracic outlet compression.  (AR 33, 1025).

The ALJ further summarized that physical examinations throughout the record were "grossly normal other than occasional indications of right shoulder deficits and minimal back tenderness."  (AR 33 (citing AR 552, 580, 583-84, 591-92, 634, 677, 714, 718, 720, 732, 734, 736, 770, 954-55)).  The ALJ also discussed the medical source opinions relevant to Cavins's right shoulder impairment.  (AR 35).  Stephen Parker, M.D., completed a disability examination in March 2018, concluding that Cavins could lift ten pounds frequently and more than ten pounds occasionally.  (AR 35, 541).  J. Sands, M.D., and Steve E. McKee, M.D., reviewing state agency physicians, opined in March and October 2018, respectively, that Cavins could lift and carry ten pounds frequently and twenty pounds occasionally.  (ECF 93-95, 106-08, 158-60, 177-79).  In July 2018, B. Whitley, M.D., another reviewing state agency physician, reached the same conclusion as Dr. Sands and Dr. McKee, except with the additional limitation that Cavins could only occasionally reach overhead with the right upper extremity.  (AR 123-25, 138-40).  The ALJ concluded that Dr. Parker's and Dr. Whitley's opinions were both persuasive, and that Dr. Sands's and Dr. McKee's opinions were "only somewhat persuasive."  (AR 35).

Ultimately, the ALJ explained that she assigned Cavins "postural and manipulative restrictions [in the physical RFC] in consideration of her shoulder and right knee pain."  (AR 33).  The ALJ further explained that while she relied on Dr. Parker's and Dr. Whitley's opinions when fashioning the right upper extremity RFC, she added an extra limitation "for only frequent feeling, handling and fingering with the right upper extremity," finding it "more consistent with the evidence received at the hearing level, especially [Cavins's] February 2020 visit with a

neurologist who noted her complaints of decreased sensation in the right hand."  (AR 35 (citing AR 1025)).

Cavins contends that the ALJ erred when considering the February 2020 nerve conduction and EMG results from Dr. Steven, asserting that "the ALJ should have consulted a medical expert regarding the updated evidence rather than formulating her own lay assessment" of the EMG and nerve conductivity tests.  (ECF 24 at 15).  But as the ALJ observed, Dr. Stevens interpreted the results of the nerve conduction and EMG studies as an "[e]ssssentially normal study of the right upper extremity."  (AR 1025; *see also* AR 33).  Nor did Dr. Stevens assign any limitations to Cavins based on these test findings.  Thus, this is not a case where Dr. Steven's report of the nerve conduction and EMG studies "contained significant, new, and potentially decisive findings" that required scrutiny by a medical expert.  *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *see also Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014); *Kimball v. Kijakazi*, No. 20-CV-871-JPS-JPS, 2021 WL 4225661 at *5 (E.D. Wis. Sept. 16, 2021) ("Seventh Circuit case law makes clear that an ALJ must submit medical records, such as MRIs, to 'medical scrutiny' if such records constitute 'new and potentially decisive medical evidence.'") (citing *Goin*s, 764 F.3d at 680)).

In sum, Cavins fails to point to any medical source opinion assigning her more restrictive right upper extremity limitations than the ALJ assigned in the RFC.  To reiterate, "[i]t is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove [her] claim of disability."  *Scheck*, 357 F.3d at 702 (citations omitted); *see also Flener ex rel. Flener*, 361 F.3d at 448 ("[T]he primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant." (citing 20 C.F.R. § 416.912(c)).  Here, Cavins has failed to carry that burden.  The right upper extremity limitations

19

assigned by the ALJ in the physical RFC are supported by substantial evidence.

*E.  Step Five Number of Jobs*

In her final argument, Cavins asserts that the ALJ did not carry her step-five burden with respect to the number of jobs that Cavins could perform.  (ECF 24 at 15-19).  As already explained, a plaintiff seeking disability benefits bears the burden of proof at steps one through four of the ALJ's sequential five-part inquiry; the burden then shifts to the Commissioner at step five.  *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  At this final step, the Commissioner must establish that the plaintiff's RFC allows her to engage in work found in "significant numbers" in the national economy.  *Liskowitz v. Astrue*, 559 F.3d 736, 742-43 (7th Cir. 2009); *see* 20 C.F.R. §§ 404.1566, 416.966.

The ALJ concluded at step five that Cavins was not disabled based on the VE's testimony that a hypothetical individual of Cavins's age, education, work experience, and RFC could still perform a significant number of unskilled, light-exertional jobs in the national economy.  (AR 37).  Specifically, the VE testified that such individual could perform the following representative jobs:  inspector/handpackager, 74,000 jobs in the national economy; laundry worker, 51,000 jobs in the national economy; and housekeeper, 220,000 jobs in the national economy.  (AR 72-73).

Cavins now argues that the ALJ failed to carry her step-five burden because the ALJ based it on the number of jobs in the national economy, rather than the number of jobs in "the region where [Cavins] lives or in several regions of the country."  (ECF 24 at 16).  She emphasizes that the relevant statute and regulations require the ALJ's step-five finding be derived from regional numbers.  *See* 42 U.S.C. § 423(d)(2)(A) ("'[W]ork which exists in the national economy' means

20

work which exists in significant numbers either in the region where such individual lives or in several regions of the country."); 20 C.F.R §§ 404.1566(a), 416.966(a) ("We consider that 'work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country."). Cavins urges that "[t]he language in the Act and the regulations strongly implies that a region is smaller than the country as a whole." (ECF 24 at 16 ("[I]f Congress had intended 'several other regions of the country' to mean the entire United States, it knew how to say that.")).

But "there is no reason to believe that the [VE] was not using that statutory definition of 'in the national economy' when testifying as to jobs available nationwide." *Butler v. Kijakazi*, 4 F.4th 498, 504 (7th Cir. 2021). Furthermore, the VE identified 345,000 jobs nationally, which is clearly a significant number under relevant caselaw. *See Alaura v. Colvin*, 797 F.3d 503, 507 (7th Cir. 2015) (finding 200,000 jobs nationally a significant number, stating "[w]hy local and state statistics are included is unclear, since if there is a significant number of jobs that the applicant for benefits can perform anywhere in the United States he is deemed not disabled"); *Jesus F. v. Saul*, No. 1:18-cv-01072-DLP-TWP, 2019 WL 6872815, at *8 (S.D. Ind. Dec. 16, 2019) ("Undoubtedly, 300,000 jobs in the national economy is going to be a significant number . . . ."). In fact, last year the Seventh Circuit found in at least one instance that just 30,000 jobs nationally was still a significant number of jobs nationally. *Mitchell v. Kijakazi*, No. 20-2897, 2021 WL 3086194, at *3 (7th Cir. July 21, 2021). Therefore, Cavins's first challenge to the ALJ's step-five finding is unpersuasive.

Moving on, Cavins also argues that the jobs cited by the VE were not responsive to the hypothetical posed by the ALJ because the VE "cited positions from the out-of-date Dictionary of Occupational Titles [DOT]." (ECF 24 at 17). But Cavins did not dispute the VE's testimony

at the hearing (*see* AR 69-75), and "[w]hen no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the [DOT's] . . . ." *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002); *see also Stark v. Astrue*, 278 F. App'x 661, 667 (7th Cir. 2008) ("Starks contends that, even though [the vocational expert] stated that his testimony was consistent with the DOT, the ALJ should have inquired further into specific characteristics of the jobs [the vocational expert] listed.  We have never held that ALJs have any such further requirement.").

Having said that, an exception exists.  Even when the VE's testimony is unchallenged at the hearing, an ALJ still has a duty to inquire if there is an "apparent" conflict between the DOT and the VE's testimony.  *Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008).  But Cavins does not identify an apparent conflict between the DOT and the VE's testimony.  (ECF 24 at 18-19); *see generally Collins v. Berryhill*, 743 F. App'x 21, 26 (7th Cir. 2018) (finding a worker's need to change for sitting to standing at will was not an "apparent" conflict with the DOT where the DOT did not specify whether jobs allow changing from sitting to standing).  And Cavins's attempts now to highlight discrepancies between the DOT and O*Net (ECF 24 at 17-18) is ineffective, as O*Net is a non-DOT source which does not trigger an ALJ's duty to resolve apparent conflicts.  *See, e.g.*, *Spurlock v. Berryhill*, No. 1:17CV411, 2018 WL 791302, at *9 (M.D.N.C. Feb. 8, 2018) ("SSR 00-4p requires the ALJ to identify and resolve apparent conflicts only between the VE's testimony and the DOT, and Plaintiff has failed to cite any authority that would require the ALJ to also identify and resolve apparent conflicts between the VE's testimony and either the O*Net or the Bureau of Labor statistics." (internal citations omitted)).  Therefore, Cavins's second challenge to the ALJ's step-five finding is also unsuccessful, and thus, the Commissioner's final decision will be affirmed.

## IV.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED.  The Clerk is

DIRECTED to enter a judgment in favor of the Commissioner and against Cavins.

SO ORDERED.

Entered this 18th day of May 2022.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

23